IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| BOGART, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CASE NO. 3:10-CV- 39 (CDL) |
| | ) |
| ASHLEY FURNITURE INDUSTRIES, INC. | ) |
| (D/B/A ASHLEY FURNITURE), ASHLEY | ) |
| FURNITURE HOMESTORE, and Does 1 | ) |
| Through 10, Inclusive, | ) |
| | ) |
| Defendants. | ) |

**BRIEF IN SUPPORT OF PLAINTIFF BOGART, LLC'S
MOTION TO EXCLUDE THE
REPORT AND OPINIONS OF LARRY EVANS**

COMES NOW Plaintiff Bogart, LLC ("Bogart" or "Plaintiff") and files its Motion to Exclude Opinions and Report of Larry Evans and shows the Court the following:

**I. INTRODUCTION**

Plaintiff is the owner of the legendary, iconic actor Humphrey Bogart's name, voice, signature, photograph, or likeness and celebrity identity (i.e., publicity rights) and related trademarks (collectively referred to hereinafter as "Bogart Intellectual Property"). In this case, Plaintiff claims that Defendants Ashley Furniture Industries, Inc. and Ashley Homestores, Ltd. (collectively referred to hereinafter as "Defendants") misappropriated its Bogart Intellectual Property by naming and commercially marketing a line of furniture as "Bogart Ocean" beginning in 2008, on the heels and with knowledge of Plaintiff's own well-known, commercially successful line of licensed furniture with Thomasville Furniture using the same "Bogart" name and mark. A portion of Plaintiff's claims for damages centers on the valuation of the Bogart Intellectual Property and Defendants' unauthorized use of same.

1

On the issue of damages, Plaintiff has put forth expert witness Jon Albert Levy ("Albert") who, with over 35 years of experience in the industry, routinely and professionally values celebrity endorsements and publicity rights deals in the marketplace and negotiates celebrity affiliation / endorsement deals between buyers and seller of such rights.  Defendants identified Larry Evans ("Evans") as their sole expert to rebut the opinion of Albert.  As shown below, Mr. Evans is unqualified to offer any admissible opinion in this case because he does not have the necessary education, training or experience on the topic in which he opines.  Accordingly, Defendants have not met their burden of showing that Evans can offer qualified, reliable testimony to assist the jury at the trial of this case and his testimony and report should be excluded from this trial.

## II.  ARGUMENT AND CITATION TO AUTHORITIES

**A.      Standard for Admissibility of Expert Testimony.**

"The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir.1999); See Hall v. United Ins. Co. of Am., 367 F.3d 1255, 1261 (11th Cir.2004); See Dukes v. Georgia, 428 F.Supp.2d 1298, 1310 (N.D. Ga.), aff'd, 212 Fed. Appx. 916 (11th Cir. 2006).  "The admission of expert evidence is governed by Federal Rule of Evidence 702 as explained by Daubert and its progeny." Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005), citing Daubert, 509 U.S. 579, 589, 113 S. Ct. 2786, 2795 (1993). "Daubert requires that trial courts act as gatekeepers to ensure that speculative, unreliable expert testimony does not reach the jury."  McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002).

To qualify as an expert, a witness must possess specialized expertise based on knowledge, skill, experience, training or education.  See Fed.R.Evid. 702.  Although an expert is not required to have

personal knowledge of the facts at issue in the case, he must be qualified "regarding the matters he intends to address." Allison, 184 F.3d at 1309.  Specifically, Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

The Eleventh Circuit has developed the following tri-part test as an outline for assessing the admissibility of expert testimony:

> Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 562 (11th Cir. 1998).

"[A]lthough there is some overlap among the inquiries into an expert's qualifications, the reliability of [the expert's] proffered opinion and the helpfulness of that opinion, these are distinct concepts that courts and litigants must take care not to conflate." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003).  As this Court has previously stated, "[w]hile the reliability analysis focuses on the bases for the proposed expert's conclusions, the *qualification* analysis focuses on the expert's general familiarity with the field in which he proposes to testify." Folsom v. Kawasaki Motors Corp., U.S.A., 509 F.Supp.2d 1364, 1377 (M.D. Ga., 2007) (emphasis added).

As shown below, Evans fails the first prong of the test regarding the admissibility of an expert's testimony because he is not qualified to render an opinion on the market value of the Bogart Intellectual Property in this case.  While Evans appears to be an extremely well educated, knowledgeable professional in the field of patent and technology licensing, he lacks any substantive education, experience or training in the valuation of celebrity endorsements or persona necessary to

3

satisfy the qualification requirements of Fed.R.Evid. 702 to provide a valuation of the Bogart Intellectual Property.  Having never studied, practiced, or received training in such valuation, Defendants' expert offers nothing beyond the kin of an average juror on the specific topic of celebrity endorsement or publicity rights valuation and, therefore, his report and testimony on the topic is unreliable and irrelevant.  This Court should therefore exclude Evans's testimony and report "from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value."  Allison v. McGhan Medical Corp., 184 F.3d 1300, 1311 - 12 (1999).

**B.     Larry Evans Is Unqualified to Render a Reliable and Relevant Opinion to Assist The Jury in Evaluating the Plaintiff's Damages in this Case.**

Both Plaintiff and Defendants agree that, assuming liability for misappropriation of the Bogart Intellectual Property, a qualified intellectual property expert may assist the jury at trial to assess the value of such property rights to determine the proper amount of damages to award.  The parties disagree strongly, however, on what are the necessary qualifications for such an expert to competently make this assessment.

Defendants take the overly broad view that an expert with training, experience or education in patent, technology and trademark licensing is qualified to testify as to the value of the Bogart Intellectual Property that was used by Defendants in this case.  Plaintiff, however, takes a far narrower view that the valuation of the use of a celebrity's name or persona in a commercial misappropriation or false endorsement / false affiliation case is a highly specialized area of expertise.  Plaintiff asserts that an expert is qualified to make a valuation of a celebrity's publicity rights and related trademarks if he or she has actual, substantive experience or meaningful training or education in real world negotiations of celebrity endorsements or affiliations between parties considering and assessing the value of (a) the celebrity's fame; (b) past and present comparable licensing deals; (c) intended use; and (d) the expectations of the parties.

The Plaintiff agrees it is certainly difficult to measure the qualities and level of a celebrity's fame and relevance of comparables, unless of course one has a working knowledge and experience in assessing the market value of similar and equally unique intellectual property. While Plaintiff's expert witness Albert has actual, extensive experience in and knowledge of the factors required to assess this value, Defendants' expert Evans's expertise in this area borders on *none*. As Evans aptly put it, his purpose to determine Plaintiff's damages using <u>Georgia-Pacific Corp. v. United States Plywood Corp.</u>, 318 F.Supp. 1116 (SD NY 1970),

> "is to simulate as nearly as possible -- It's a hypothetical negotiation that simulates as nearly as possible what would have happened in the real world had the two parties actually sat down and negotiated, rather than the accused infringement occur. ***And one can only analyze those factors, in my opinion, if he's had experience actually in negotiating a royalty, a determination of a royalty***. And one looks at each of the factors and determines if the two parties are sitting at the table negotiating a license, what would have been the result." (Evans Dep. pp.35, ln. 18 – p. 36, ln. 5) (emphasis added). (*Referenced pages from Larry Evans Deposition, taken on January 11, 2012, are attached hereto as Exhibit 1, and is hereinafter referred to as Evans Dep.*)

Evans own testimony disqualifies himself as an expert in this field: Evans has no significant experience in negotiating a celebrity endorsement license or royalty that he says is required to make this determination.

The intellectual property at issue here is fundamentally unique and sits in an extremely small subset of modern intellectual property: the value of a legendary, iconic Hollywood actor's identity and persona and his endorsement or affiliation with a commercial concern. The Bogart Intellectual Property is connected to a single human being, of supreme notoriety, and is composed of the essence of that person; a celebrity persona that is indelibly connected to the life and history of one of the most quoted and famous actors in history. The value to such intellectual property here is driven by past and present comparables and by Humphrey Bogart's current fame, recognition, legacy and the interests companies have in tying his persona and name to a particular good (i.e., branding). McCarthy, <u>The</u>

5

Rights of Publicity and Privacy 2011, § 11:32, p. 742; See National Bank of Commerce v. Shaklee Corp., 503 F.Supp.533, 546-47 (W.D.Tex.1980); King v. Ames, 179 F.3d 370, 51 U.S.P.Q.2d 1446 (5th Cir. 1999); See also, Treece, Commercial Exploitation of Names, Likenesses, and Personal Histories, 51 Tex. L. Rev. 637, 651 (1973) (plaintiff can prove value of identity by reference to the "going rate for endorsements by celebrities of his stature."). Importantly, Defendants' expert Evans claims that fame is "ephemeral" but still important in measuring in the valuation of the valuation of publicity rights. (Evans Dep. pp. 25, ln. 22 - p. 28, ln. 1; pp. 33, ln. 20 - p. 34, 1 - 18). Despite this admission, along with his lack of qualifications to ascertain the value of Humphrey Bogart's or any celebrity's "fame" and its impact on endorsements or hypothetical licensing negotiation, Evans still proceeds to provide a valuation in his written report which entirely omits celebrity "fame" or "stature" as a factor in his calculation. (Evans Report, with C.V., is attached hereto as Exhibit 1).

In contrast to Plaintiff's position regarding qualifications of expert witnesses, Defendants' expert Evans asks this Court to broadly accept that the factors that go into general trademark and scientific patent licensing are the same as that of licensing publicity rights or negotiating a celebrity's endorsement, and based upon this assertion, he claims he is adequately qualified to value the Bogart Intellectual Property. (Evans Dep. p.27, ln. 22-25). Evans's only support for this proposition is his unspecific recollection of a few meetings and conversations with peers on the topic. (Evans Dep. pp. 26, ln. 17 – p. 27, ln. 24; p. 32, ln. l4-25; p. 33, ln. 1-2). Evans goes so far as to assert that the methodology of establishing valuation of all forms of intellectual property are consistent with "revenue based use." (Evans Dep. p.25, ln. 4-17). His analysis, taken as a whole, is not one based in celebrity or even non-celebrity product endorsement or publicity rights licensing experience related to branding, but one based in licensing practices specific to his own field of expertise, i.e., patent and general trademark licensing.

Just as Albert is not qualified to provide expert testimony on the value of an engineering patent or technology license, Evans is similarly unqualified to value celebrity endorsements or publicity rights. Evans has simply offered no basis for his forced analogy between such licenses and his field of experience. In fact, Evans's position is no different that a pediatrician attempting to provide expert testimony to rebut a neuroradiologist's testimony as to the standard of care in performing an neurovascular angiography. Indeed, both are medical doctors and the pediatrician may have a general understanding of the procedure, but having neither performed nor obtained specialized training or education in the procedure, the pediatrician would neither be qualified to perform the procedure nor to rebut the neuroradiologist's testimony. For the purposes of FRE 702, however, the pediatrician could be qualified if she engaged in an extensive study of the procedure, but even then her opinion would be lacking having not performed one. Here, not only does Evans lack any significant experience in valuing publicity rights or celebrity endorsement, but he also has neither studied nor could recall a single article or treatise on the subject, and he does not recollect the substance of any specific seminar or training to support his analysis in this case. (Evans Dep. pp.31, ln. 16 – p. 32, ln. 1 - 3; p. 68, ln. 10 - 12).

**1. Summary of Larry Evans's Opinion.**

Evans testified that his report and attached C.V. contains substantively all of his opinions in this case and his complete list of employment. (Evans Dep. p. 6, ln. 6–9; p. 23, Ln. 3–22; Evans Report and Exhibit A attached to Evans Report).

As described in his report and in his deposition, Evans states that he is offering his rebuttal opinion as to the reasonable royalty rate that would provide Plaintiff with adequate compensation for the misappropriation and infringement of the Bogart Intellectual Property. (Evans Report, ¶ 19). Using the factors identified in Georgia-Pacific Corp., Evans finds that a reasonable royalty rate

necessary to compensate Plaintiff would be no more than 1% of Ashley's net wholesale sales (Evans Report, ¶ 38) of the "Bogart Ocean" products of approximately ▮▮▮▮▮. (Id., ¶ 28).  Evans stated he based his opinion on all of Plaintiff's prior licensing agreements and settlements. (Evans Report, ¶ 2).

      Evans calculates the damages using factors that he asserts other licensing practitioners use in hypothetical negotiations between two parties to determine reasonable royalties for a license for one party's use of intellectual properties and related rights owned by another.  (Evans Report, ¶ 2).  Evans states in paragraphs 20 and 22 of his report he used analytical methods to establish the reasonable royalty rate for Defendants' use of the Bogart Intellectual Property that are common in the valuation of all intellectual property, whether it be trademarks, copyrights, or patents.  (Evans Report, ¶¶ 20 & 22). Evans, however, provides absolutely no basis in his report or through his testimony to support this sweeping position.  (Evans Report).  In Evans deposition, he could not cite to any legal or professional opinion, treatise or example in practice where his methodology was applied in the context of a celebrity endorsement or publicity rights.  (Evans Dep. p. 52, ln.3 – p. 53, ln.3).  The closest he could come to any support was his vague recollections over his career wherein it struck him that there was no dramatic difference between the valuation of various types of intellectual property:

> Q.    Do you recall anything in particular of stories or experiences that your peers have relayed to you regarding celebrity endorsement deals or celebrity name licensing deals?
>
> A.    Not specifically.
>
> Like I say, I'll repeat, it's my recollection from all of my experience within these discussions in these meetings and reading their papers and the presentations, that there was a dramatic similarity and that licensing intellectual property, whether it's celebrity rights or rights to publicity or patents or copyrights or trademarks, depends upon the value of the license, depends upon the use, the extent of use.
>
> And the extent of use depends upon the scope of the technology, scope of the intellectual property, the --

> For example, the fame of the celebrity is similar to the fundamental nature of the patent or of a trademark. So I --
>
> My memory is that I saw nothing dramatically different in these areas.

(Evans Dep. pp. 32, ln.23 – p. 33, ln.20)

2. **Summary of Larry Evans's Qualifications.**

Evans holds a bachelors of science in chemical engineering, a Juris Doctor degree, and has been admitted to practice law before the United State Patent and Trademark Office for approximately fifty years. (Evans Report, ¶ 2). He has an extensive background and experience in the application, compliance, enforcement, monitoring and licensing of engineering patents, primarily on behalf of various corporate employers (e.g., Archer-Daniels Midland, The Standard Oil Co. – Ohio, and B.P. America) and as an independent consultant to various businesses. (Evans Report, ¶¶ 4-6, 14). Evans has held memberships in various intellectual property professional groups and licensing associations, including executive or chaired positions, and has been widely published and presented speeches on licensing patents and trademarks. (Evans Report, ¶¶ 7-13). There can be no doubt that Evans has had an accomplished and successful legal career, especially in the field of patent law and licensing. (Evans Dep. p. 27, ln. 2 – 24).

Although Evans has testified as an expert in numerous other cases, this is his first and only case in which he is being presented as an expert on the issue of valuing a celebrity's endorsement or publicity rights. (Evans Dep. p. 14, ln. 2 – 8; p. 18, ln. 10 – 21).

3. **Larry Evan does not have Sufficient Education, Training or Experience to Render a Qualified Expert Opinion as to the Value of Plaintiff's Intellectual Property.**

Evans does not have the training, education or experience necessary to qualify him as an expert in valuing a celebrity's publicity rights (i.e., name, image or celebrity identity) or endorsement in a licensing transaction. Accordingly, he is not qualified to render an expert opinion to rebut Plaintiff's

expert on the market value of the Bogart Intellectual Property and the damages suffered by the Plaintiff by the Defendant's alleged unauthorized use.

### *i.     Larry Evans has no training or education in negotiating or valuing the type of intellectual property at issue in this case.*

Evans's deposition testimony makes clear that he has never attended an educational course or obtained any certification in the valuation of celebrity endorsement (Evans Dep. pp. 12, Ln. 25 – p. 13, ln. 2; pp. 13, ln. 22 – p. 14, ln. 1), and has never published any articles on celebrity endorsements. (Evans Dep. p. 24, ln. 16-21).  Education does not, therefore, form the basis of Evans's qualification to offer expert testimony in this case.

### *ii.    Larry Evans has no meaningful experience in negotiating or valuing the type of intellectual property at issue in this case.*

If a witness relies upon experience as a primary qualification for the opinion, the witness must still explain how that experience is reliably applied to the facts.  <u>United States v. Frazier</u>, 387 F.3d 1244, 1260–61 (11th Cir. 2004) (*en banc*) (internal quotation marks omitted).  The Court cannot simply take the expert's "word for it," but must ensure that the opinion rests on a reliable foundation. <u>Id</u>. at 1261.  In this case, Evans ask this court to do that just that, stating:

> Q.    What training, education or experience do you have, though, that let's you make the statement that publicity rights and celebrity endorsement deals are treated similarly with patent valuation?
>
> A.    I think that's a very open ended question. I appreciate it.
>
> I've been involved in licensing and intellectual property for 50 years. And I think over those 50 years, I've been exposed to all forms of intellectual property.
>
> I've been -- I doubt if there's an individual that could sit at this table who has more experience than I do in licensing intellectual property in all forms, in valuing intellectual property.
>
> I just -- I really can't imagine someone having more experience in the general area. And I --

> For example, my personal employment at Standard Oil and at Archer-Daniels-Midland and BP America focused on chemicals, but we also were involved in electronics, batteries, capacitors, computer programs, things of that nature.
>
> Since I left the corporation, I've testified -- I've both consulted in licensing and also testified in cases involving medical devices, pharmaceuticals, computer programs, software.
>
> I'm currently involved in a rock crushing case.
>
> So my experience is very, very broad. Biotech, I have had several cases in Biotech. So I feel that I have the experience necessary to testify in most anything involving intellectual property.

Q.   In any intellectual property?

A.   Correct.

   (Evans Dep. pp. 26, ln.17 – p. 28, ln.1)

In this case, Evans cannot offer any experience that would suggest his opinion rests on any foundation.  While Evans testified in his deposition that he has never represented any clients in any meaningful celebrity endorsement transactions (Evans Dep. pp. 12, ln. 25 – p. 13, ln. 2; pp. 13, ln. 22 – p. 14, ln. 1), he stated that his one brush with celebrity licensing occurred in the late 1980s when he negotiated a licensing deal with a the actor who played "Radar" on the television show "M.A.S.H." to perform in a series of television commercials for B.P.  (Evans Dep. p. 14, ln. 9 – p. 17, ln. 17).  Evans could not recall the specific details of the transaction and he even questioned why the marketing team wished to pursue a celebrity or recognizable figure at all in the commercial.  (Id.).  Despite the fundamental and profound differences between (a) hiring "Radar" to act in a B.P. television commercial and (b) valuing Humphrey Bogart's name, publicity rights and related trademarks for use in an international furniture branding deal, Evans's one "celebrity" deal over twenty years ago simply cannot for the basis of sufficient experience needed to qualify him to offer expert testimony in this case.

Despite his lack of education, training or experience in the field, Evans attempts to support his claim of expertise and qualifications in the celebrity endorsement and publicity rights field by broadly asserting that he believes practitioners in the field use the same methodology to value a celebrity endorsement is used in a patent or simple trademark case or, for that matter, in all fields of intellectual property. (Evans Dep., p. 24, ln. 22-25; p. 25, ln. 4–17; p. 26, ln. 17-25; p.27, ln. 22-25; Evans Report, ¶¶ 20 & 22). He says that because he is qualified to render an opinion as to the value of a patent in a patent infringement case, by analogy alone, he is equally qualified to render an opinion on valuation of celebrity endorsements, celebrity trademarks or the use of celebrity's persona. (Evans Dep. pp. 24, ln. 2 - p. 27, ln.25; pp. 28, ln. 6 - p. 30, ln.5; pp. 31, ln. 16 - p. 35, Ln. 15). Despite the complete lack of any legal or professional authority to support his sweeping assertions, Evans is asking the Court to simply trust that he's qualified as an expert to value the Bogart Intellectual Property based on his 50 years of experience in licensing patent technologies and membership in various professional organizations. Id.

Reflecting on his entire education, experience and training, Evans could not recall and did not cite in his report one specific meeting, seminar or conversation regarding the topic of the valuation of celebrity endorsement or publicity rights. (Evans Dep. pp. 26, ln. 17 – p. 27, ln. 24; p. 32, ln. l4-25; p. 33, ln. 1-2). The best recollection he had that raised his awareness on publicity rights was a speech he heard about Harley-Davidson, Inc. and that he believed the motorcycle manufacturer could have its own right of publicity. (Evans Dep. pp. 9, ln. 1 – p. 12, ln. 16). It is merely Evans's vague recollection and opinion that the methodology he has used in patent license valuations, wherein he appears supremely qualified, is no different from the valuation of celebrity endorsements or the right of publicity. (Evans Dep. p. 24, ln. 22-25; p. 25, ln. 4–17; p. 26, ln. 17-25; pp. 32, ln. 14 – p.33, ln.2). Based on his basic ignorance of publicity rights law and its elements and lack of any experience

valuing celebrity endorsements and publicity rights licensing, it is not possible that Evans properly assessed and reliably valued the Bogart Intellectual Property in this case.

> ### iii. Larry Evans has not studied or relied upon any authoritative texts, periodicals or treatises to educate himself on negotiating or valuing the type of intellectual property at issue in this case.

Case law and treatises on right of publicity and celebrity misappropriation/false affiliation consistently state that the appropriate measure of damages for misappropriation is the market value of a celebrity plaintiff's publicity rights and name as used by the infringer – not simply what the infringer would want to pay if caught for the misappropriation ex post facto.  In particular, under Georgia law a plaintiff is allowed to recover the marketplace value of the celebrity or persona in the commercial setting in which the defendant used it.  See, e.g., Cabaniss v. Hipsley, 114 Ga. App. 367, 151 S.E.2d 496, 590 (1966) (plaintiff "would be entitled to recover its advertising value for the time and manner in which it was appropriated, as actual damages."); Alonso v. Parfet, 253 Ga. 749, 3325 S.E.2d 152, 52 A.L.R.4th 151 (1985) (measure of damages "is the value of the benefit derived by the person appropriating the other's name or likeness.").

"For 'celebrities,' a market value of publicity rights can be ascertained relatively easily by testimony as to "comparables," i.e., the amounts received by comparable persons for comparable uses. McCarthy, The Rights of Publicity and Privacy 2011, § 11:32, p. 742; See National Bank of Commerce v. Shaklee Corp., 503 F.Supp.533, 546-47 (W.D.Tex.1980); King v. Ames, 179 F.3d 370, 51 U.S.P.Q.2d 1446 (5th Cir. 1999) (daughter of deceased celebrity musician was permitted to testify as to her opinion of the reasonable value of the use of the identity of her deceased father, Freddie King, by defendant in its unpermitted marketing of compact discs of King's recordings.)  See also, Treece, Commercial Exploitation of Names, Likenesses, and Personal Histories, 51 Tex. L. Rev. 637, 651 (1973) (plaintiff can prove value of identity by reference to the "going rate for endorsements by

celebrities of his stature."). Beyond his one deal involving "Radar" from M.A.S.H. and his general intellectual property background, Evans admits he has no experience calculating the market value of a celebrity endorsement. (Evans Dep. p. 67, ln. 6 –17)

Beyond being unaware of or intentionally ignoring these authorities, Evans testified that he has never read any intellectual property treatises or textbooks that discuss market valuation or the market value of intellectual property rights. (Evans Dep. p. 67, ln. 20–24; p. 68, ln. 10–12). He also failed to refer to any treatise on the topic in preparing his particular report in this case. (Evans Dep. p. 31, ln. 16 - 25). In fact, Evans believes he does not need to consult any treatise because he is already "aware of most everything of substance that has been prepared concerning intellectual property and intellectual property licensing." (Evans Dep. pp. 31, ln. 16 – p. 32, ln. 3).

When questioned on J. Thomas McCarthy, one of the preeminent authorities in the fields of publicity rights and trademark law in the United States who has authored numerous, seminal treatises on these subjects, Evans stated that (1) he knew Mr. McCarthy; (2) he has not read any materials written by Mr. McCarthy; (3) he thought Mr. McCarthy did not have much experience in the field of rights of publicity; and, finally, (4) thought Mr. McCarthy was simply "attempting to write a hornbook that's going to sell." (Evans Dep. pp. 67, n. 25 – p. 69, ln. 25).

### III.   CONCLUSION

Courts must "'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010) (quoting Kumho Tire Co., 526 U.S. at 152). Here, Defendants' expert Evans has no professional studies or personal experience in valuing a celebrity's publicity rights (i.e., name, image or celebrity identity) or endorsement in a licensing transaction to support his testimony. Accordingly,

he cannot exercise in this case any analysis or provide any opinion that is reflective of or grounded in the practice of celebrity endorsement licensing or publicity rights valuation and, therefore, is not qualified to render an expert opinion to rebut Plaintiff's expert on the market value of the Bogart Intellectual Property and the damages suffered by the Plaintiff by the Defendants' alleged unauthorized use.  For the foregoing reasons, Plaintiff requests the Court grant its Motion and exclude the report and opinions of Larry Evans from evidence and trial in this matter.

      Respectively submitted this 22th day of September, 2012.

    s/ Michael O. Crain
    Georgia Bar No. 193079
    Counsel for Plaintiff

CRAIN LAW GROUP, LLC
297 Prince Avenue, Suite 24
Athens, Georgia 30601
(706) 548-0970 – Telephone
(706) 369-8869 – Facsimile
e-mail: mocrain@crainlawgroup.com

    s/ Cash V. Morris
    Georgia Bar No. 155007

MAYER & HARPER, LLP
297 Prince Avenue, Suite 24
Athens, Georgia 30601
(706) 688-9791 – Telephone
(706) 369-8869 – Facsimile
e-mail: cmorris@mayerharper.com

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I served the foregoing **BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE REPORT AND OPINIONS OF LARRY EVANS** with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of records:

    Charles Burke, Esq. <CBurke@wcsr.com>
    Robert D. Mason, Jr., Esq. <RMason@wcsr.com>
    Matthew L. Jamison, Esq. <MJamison@wcsr.com>
    Womble Carlyle Sandridge & Rice, PLLC
    One West Fourth Street
    Winston-Salem, NC 27101

This 22st day of September 2012.

                                                <u>s/ Michael O. Crain</u>
                                                Michael O. Crain, Esq.
                                                Ga. Bar No. 193079

Crain Law Group, LLC
297 Prince Avenue, Suite 24
Athens, GA  30601
Tel: (706) 548-0970
Fax: (706) 369-8869
e-mail:  mocrain@crainlawgroup.com